Good morning, we are hearing 25-60348, NetChoice LLC v. Fitch. Mr. Stewart. Thank you Judge Richman, may it please the court. I'm Scott Stewart on behalf of the Mississippi Attorney General. The district court in this case issued a facial First Amendment injunction blocking Mississippi's law targeting online predators. This court should reject that injunction for three independent reasons. First, the injunction defies this court's mandate in this court, in this very case. Second, the injunction conflicts with controlling First Amendment law. And third, NetChoice is unworthy of equitable relief and shouldn't be granted any injunction at this time at all. I'll go right to the mandate rule, the quickest, and surest, and most fundamental reason why the district court erred in this case. The reason is simple, we've laid it out in our brief, especially pages two to seven of our response brief, which also rebutts NetChoice's various points. The dispositive point in this case is that the district court granted the same facial relief that this court vacated in Fitch without doing what Fitch required. Fitch held that the district court could not issue an injunction blocking Mississippi's law in all applications to all covered NetChoice members without conducting a fact-intensive facial analysis. On remand, the district court issued the same injunction as it did before, blocking the act in all applications to all covered NetChoice members without doing that fact-intensive facial analysis. That's a plain violation of the mandate rule the court should reverse on this ground alone. I do want to, although that's a complete ground for reversal, there are two other grounds that I want to make sure to hit as well. The merits, of course, and the equities, too. Maybe the equities point is a little briefer, and it's perhaps in some cases a little different than the court often sees in preliminary injunction postures, so I may just try to hit that quickly. NetChoice, as we explain in our papers, I guess let me step back. We have a very strong, the state has a very strong traditional case on the equities, affirmative case about irreparable harm, balance of equities, all those sorts of things. But we have another feature in this case that you don't always see and perhaps don't often see in this context, and that is NetChoice has now repeatedly defied or tried to get lower courts to defy orders of higher courts. That is inconsistent with basic fundamentals of our legal system. This court has recognized the problem. I think the stay panel in this case very swiftly issued a stay, I believe according to the docket, 32 minutes after stay briefing, and I think that was justified because on its face here, there was defiance with this court's prior mandate. I don't hold that, I emphasize very strongly, we said this in the very first sentence of our opposition to the injunction brief, NetChoice urged the district court to defy the court's mandate in this case. Fitch was quite clear. It laid things out quite simply as to what NetChoice wanted to do. NetChoice didn't do that. It sought the same relief as before, and this court just should not allow that. I think Justice Kavanaugh's opinion pointed out something quite important that I think is correct, which is that at the stage of the case, at the stay posture, was that the equities did not support NetChoice. Well, but he also said it was likely unconstitutional. I mean, I guess, so our mandate in the prior case did not direct the district court not to entertain an amended complaint or as-applied claims. That's what NetChoice did. They amended their complaint. They asserted new claims. The district court treated those claims, and as I understand your argument, it may be a different issue as to whether the district court properly analyzed the as-applied claims or went section by section in the act, that sort of thing. But it's a point that the district court just brazenly violated our mandate. I mean, the case sort of, the complexion of the case changed a bit. So I don't know if you want to respond to that, but it's a little bit concerning for me to sit here and think about writing an opinion that says district court, you just violated our mandate. Here's the case back. Try again. I mean, is that what you want us effectively to say, or is there some other relief we would grant? So two points on that, Judge Wilson. I think, number one, I do think there's something to be said for going a little bit farther than violation of the mandate. And I think the court has everything it needs to issue a more affirmative, decisive First Amendment ruling at this first stage of the case. The other thing I'd say is, and this is picking up on the word brazenly, I take this court's lead in MD versus Abbott, where the court found a very square mandate rule violation. But the court also said, look, we don't question the district court towards good faith. The district judge in this case is a very fine judge. We don't question his good faith. We're just saying he got it wrong. I guess I was going to ask, you've got MD. I was on that panel, and that was sort of a serial situation where the district court had evidenced in the record, frankly, a desire to do what the district court wanted to do irrespective of what the Fifth Circuit had directed. And it was a repeated, it was a repeated case. Here, though, it seems a little bit muddled. I mean, what's your best case that would support the idea that we would just send this back based on the disregard of the mandate? Well, I think we do have a repeat situation here. I mean, the key decisions Well, the law keeps changing, though, as well. And the Supreme Court has weighed in, obviously. And the complexion of the case changed. We've gone from facial to as applied challenges. Do we just disregard and say, well, this is effectively facial? And so we disregard what the district court did, or what? I think it's facial, period. I mean, under this Court's prior ruling, an injunction that blocks all applications to all covered members is facial. I mean, that's the fundamental premise of the first mandate. There would have been no reason to vacate if it had not been facial relief. Is there a trial date in this case? There is not, Your Honor. The case has been paused as it's gone up the appellate chain each time. Are you asking us to narrowly tailor or have the district court narrowly tailor injunctive relief? Or do you believe there's no injunctive relief available at all? No injunctive relief available at all at this time, Judge Englehart, because it's just NetChoice hasn't met its burden. And I think that's fundamentally what I would keep coming back to, is that And what does Moody require at the district court level? What is your expectation in terms of evidence? Sure. So at the very minimum, NetChoice would have to come forth with some evidence, perhaps declarations that say, look, these are the commercially reasonable efforts that all of our covered numbered platforms would have to take for each of the provisions that they're challenging. They have to identify their different services and explain what those are. I think the term that the Fitch panel, the first panel used, was the unique regulatory burden for each platform. And to bear that out, I mean, to this day, NetChoice has never identified a single commercially reasonable effort for any application for any covered platform. So I think that would be the bare minimum, the basic start. And that's sensible, and that applies to some extent either facial or as applied. I mean, to know if a statute violates the First Amendment, you have to know what the statute requires a regulated party to do. And particularly in the social media context, when you're dealing with some pretty big actors that are not monolithic, you have to know, well, what are all of Facebook's things? You know, it has some things geared towards adults, some things geared towards minor. It does some age verification. It does impose some limitations. And what are all those features, and how would it have to respond and actually comply with that? And unfortunately, NetChoice has just refused to make that presentation. And that's our basic pitch, is that, and this actually ties into what I think I was responding to with Judge Wilson, is there is a repeated defiant quality here, because it's not just the prior mandate in Fitch. NetChoice is a party in Moody, it's a party in Fitch, and it's repeatedly getting told, hey, this is your facial burden, and it keeps going back down to the law. We're past facial burden. We're as applied now. So it seems to me there needs to be discovery, there needs to be hearings, perhaps trial. Is that going to happen? I'm comfortable with that, Judge Richman. What I'd say is it's not the state's burden to come forward with the evidence. NetChoice has to do it. Instead of doing that, it just keeps filing what is in effect the same preliminary injunction motion each time. And that's our basic problem. Ultimately, facial as applied, whatever it is, it's NetChoice's burden to make the showing it needs to. And tacking on the label as applied for what is essentially the same remedy doesn't do it. I think one point I think bears emphasis here is that NetChoice comes before this Court and suggests that what the district court granted was as applied relief. That's not tenable. What NetChoice, as we pointed out, this is pages 750 to 751 of the record on appeal. NetChoice went back down after this Court's prior decision, and it made an argument for as applied relief that spanned one-third of one page. That was its as applied argument. And it's now suggesting to this Court that, oh, in fact, what the district court really did was grant as applied relief when NetChoice didn't argue it, didn't present it, didn't do anything like that. And it's just not tenable. Again, we're dealing with two injunctions that impose relief that's identical in every way that matters without doing what this Court required. And I think the Court was quite clear. I mean, pages 807 to 809 of the first opinion of Fitch are not that hard to follow. And, you know, the first sentence in our preliminary injunction opposition to the district court was, look, NetChoice is asking this Court to defy the Fifth Circuit's mandate. We did everything we possibly could to try to make it so we didn't have to come back up and kind of do this whole run again. It's almost a year to the day since I last stood before this Court in this very case saying, hey, this is not consistent with facial statements. You made a point, and you make a point in the briefing, about NetChoice's, the equities case, and NetChoice's behavior in other cases in terms of, I guess, flaunting mandates or goading courts to do the same, et cetera. What's your case law and support, your best support for the idea that that would weigh into our balance of the equities in this case? You see what I'm saying? Like just sort of extra case conduct feeding into the equities here. Sure, Your Honor. I mean, I think what I mainly draw, it's, I don't have a readily, like, this is the factually similar case, but I think it's similar to, uh, whenever- It's an odd posture for injunction to basically say, consider all this other behavior that they've been doing in other similar cases, right? I mean, that doesn't happen all the time. It, it's not all, not all the time. You don't, you don't see it that much, Judge Wilson. I will say, though, that when you're considering the balance of the equities to public interest, you are sort of looking more broadly about, hey, how will this affect the public interest? You are thinking and accounting for the public. And I think, uh, there was a strong public interest, of course, in this Court enforcing its own orders, but also- Where, where are your cases that support this proposition? I would say DHS versus DVD, the Supreme Court's decision enforcing its own prior, prior, uh, interim relief ruling in that case. We, we cite that. Um, I, I do think MD versus Abbott is, is in the same mold. Again, these are, those cases show, the mandate rule cases just as a whole show, I think, the basis of the rule shows that there's a strong public interest in enforcing, uh- All right, but let's, uh, that'll get you so far, but in terms of preliminary injunctive relief, ultimate relief, that, that falls out, it seems to me. That's just not a consideration. Is it- Are, are you saying at the end of the case, Your Honor? Yes. When we're looking at ultimate relief- Well, I think if they were still, if they're seeking a permanent injunction, there, there's still kind of a showing to be potentially made there, but I think if you're saying rule on the merits, then I, I do agree that that's separate from a final definitive ruling on the merits. But, but here, as I think Your Honor alluded to Judge Richman earlier, we're kind of similar to the way things were in Moody where the, where the Supreme Court kept emphasizing this case is at a very early stage. I mean, despite the fact that we're a year and a half into this case, we're still at a preliminary injunction stage where net choice which bears a heavy burden has not offered very much. I mean, they just have a handful of declarations that don't really take seriously the text of the statute here. And again, we just keep on kind of having to go, go up and down to kind of get it right. But ultimately, if they make a full merits showing, that would be a different deal. At this stage, I think however you slice it, they just haven't made the showing. I mean, just on the face of what they've presented and, you know, when you compare that side by side with especially page 809 of Fitch, they just don't, they just don't align. Just not what this Court called for. And then you look at Moody, you look at Paxton about emphasizing the nature of a fact-heavy factual analysis. That requires a factual presentation by net choice. And it's one they continually fail to make. And just, just to emphasize this, they will say, you know, they can say like we've come, we've come forth with declarations, we filed a new declaration, all irrelevant because they have never presented for even a single application what the commercially reasonable actions would be for even a single covered member. That's squarely what this Court required. It's obviously required for facial relief, but it's also required to even hold a single application about it. Again, you have to know what the applications are to know whether to burden speech, how they will, and then whether that violates the First Amendment or meets the appropriate standard of, standard of review. I think, Judge Wilson, you mentioned Justice Kavanaugh's opinion. You know, I think it's fair to point out that Justice Kavanaugh did have a preliminary view on the merits in the case. But also curious because it's not often a court would hang its hat on the equities as opposed to likelihood of success on the merits. Right. And that's why I think it's a bit notable to say, hey, I think the net choice has likely made the showing, but the equities don't support them. And what I'd say is that that, that is a correct assessment on the equities and nothing has changed that matters. The only thing net choice suggests has changed is that some platforms have restricted access or this kind of thing. But as we've explained in our reply brief, all they bring forth is two platforms that are covered members that every one they mentioned, they make a presentation that cannot be squared with the plain text of the act. They're not based on sound factual submissions. But then what do we do with Justice Kavanaugh's forecasting on the merits? Well, here's what I'd suggest, Your Honor. I think, you know, one thing that becomes apparent in kind of the run of net choice cases is net choice tends to do pretty well on a very short fuse and it tends to do pretty well as a result on a short fuse district court situations. Net choice tends to do less well when things go on appeal and further, deeper consideration, more time, more unraveling of their arguments becomes apparent. They've had, they've obviously had this court's decision in the Fifth Circuit. They've had decisions for them in the Ninth Circuit that have not gone the way they would want to. So I think this area does have its challenges and complexities and it can take a little bit more time to unravel. And although I respect very much Justice Kavanaugh's view, it was a view of one justice at a preliminary posture. And I think the equitable point is extremely powerful for us. And when a party needs to make, I may have finished my sentence, Your Honor. I apologize. When a party needs to carry the burden on all four equitable factors and it can't do it on those last two balance of equities, public interest factors, injunctive release should be denied. Thank you, Your Honor. Counsel, before you begin, would you advise us the status of the Louisiana and Texas net choice cases? Yes, may it please the court. Scott Keller for net choice. The Texas, the challenge to Texas House Bill 20 is currently back on remand for the district court. Discovery has not yet commenced. There's briefing analyzing the scope of that statute. The Louisiana case, we have a final judgment in that case. We prevailed and Louisiana has appealed that and briefing is ongoing. Okay, thank you. We heeded this court's advice and the Supreme Court's guidance in moody, which claims about a law's entire coverage versus claims about specific websites. So on remand, we added as applied claims, focusing on these nine specific websites here. And the district court properly resolved those claims first and tailored its injunction to just these nine websites. Indeed, the district court would have violated this court's precedent if it would have jumped ahead and address the facial challenge before the as applied claims. All of this complied with the court's prior mandate. We never urged any violation of any mandate in this case or any other case. Now the district court, sorry, this court's prior opinion addressed only the first step of moody's facial challenge framework about identifying laws for coverage. And the primary reason for the court's prior opinion sending it back down was the district court's first preliminary injunction order was issued the very same day as moody and that was the primary concern. But that step, that first step in moody's two-step music as this court's first opinion put it, just isn't required when we're talking about claims regarding specific websites like we have here now. And on the merits, this is a content-based speech restriction. It favors sports and news websites. It prioritizes social interaction over work or professional content. And besides being content-based, this law violates the First Amendment rights of these nine social media websites and their users in many more ways. The parental consent provision violates Brown. The age of the law violates the parental consent provision. It violates the rights of the parents and the guardians of posts of fully protected speech. So in Fitch 1, the district court listed several things, I should say the court's opinion listed several things that the district court, quote, did not determine. Aren't some of those things still necessary for an as-applied challenge in terms of factual determinations? I don't believe so for two reasons. I think the two things that the first opinion pointed to, and again, after finding standing and after our conduct is arguably prescribed and then we can raise a pre-enforcement challenge, the court then on the first step of moody's said, well, district court, you didn't look at the full coverage and you didn't analyze are services like Uber or Google Maps or Draft Kings or Microsoft Teams covered? Well, on the as-applied claims, that just falls out and this law doesn't cover those anyway. This is our briefing in ROA 727 and 748. And then on the commercially reasonableness aspect of this law, the court in the first opinion was talking about that from the context of how is that statutory term used in this statute? It wasn't making a first amendment merits ruling that somehow adding a commercially reasonable qualifier is a safe harbor. All this was about statutory coverage and we know we have standing. We know we can raise a pre-enforcement challenge. As the court's first opinion said, the attorney general is credibly threatening enforcement against these nine websites. Indeed, the attorney general sought a state pending appeal of this preliminary injunction for these nine websites. That's the best evidence possible that credible enforcement, that there's a credible threat of enforcement here. So to take commercially reasonable just directly, if we're, if our conduct is arguably prescribed, then commercially reasonable as a statutory qualifier might make a difference if the defendant were here saying, hey, they're not covered and therefore we're going to disavow enforcement. But that's not the situation. We've asked multiple times. We've asked the defendant, will you disavow enforcement? Are we not covered? And every time the defendant says no, in fact, it sought a state pending appeal. And so what we're talking about here is free speech litigation. And it's not our burden to present evidence as to how the state is defining its own law. Here, take the commercially reasonableness test directly. This is their brief at page 53. They say that what this means is a sliding scale based on every single individual website's own resources. That introduces all sorts of unconstitutional vagueness. As the Georgia District Court in Carr held, that is a recipe for disparate enforcement. I don't know how to advise my client what that means. Is it the cost of technology compared to the revenue of a company? And so when we're being charged with showing, is our conduct arguably prescribed? Yes, it is. We can raise a pre-enforcement challenge. We know that from the first opinion. At that point, now we're entitled to a merits ruling on our as-applied claims. So I think some of the jousting that you see between my friend and us on commercially reasonableness is the defendant is trying to treat that as a First Amendment holding. It wasn't. I would submit that any speech restriction doesn't become constitutional just by tacking that on. Brown wouldn't have come out differently if California required just commercially reasonable means of obtaining parental consent to buy violent video games. Packingham wouldn't have come out differently if North Carolina had said, hey, you need to use commercially reasonable means to block certain users on social media. And I think the most straightforward way to resolve the case on the merits is that this is a content-based speech restriction. It excludes sports websites, news websites. If X tomorrow decided it was only going to disseminate news or if YouTube tomorrow decided it was only going to disseminate sports, it wouldn't be covered. That's as content-based as it gets. So that triggers strict scrutiny. And when you look at the tailoring, this law is far from narrowly tailored. Parents have many options to oversee their children online. This is in our brief at page 7. They have device level, network level, software level. Indeed, our members also provide parental tools. And the state could give parents information. That's the Playboy case from the United States Supreme Court. Also, our member websites do extensive content moderation, particularly in the monitoring and censorship provisions of this law. We've detailed it in our new declaration, the Cleveland Declaration. You know, I'm listening to all this, and the reality is I think that, I mean, this strikes me as very different than Moody, at least, because Moody was about content moderation and balancing the feeds and all that sort of thing. This is about basically protecting children from predators to the extent that it's the interactive messaging features or the ability to reach a user by another user, that sort of thing. It has nothing to do with professional or social or whatever. What it has to do with is not just looking at the feed as it comes by, but being able to make contact with other users. And, I mean, I don't see how that burdens or protects or implicates speech other than, I mean, nothing changes about a particular user's feed, right? Well, Judge Wilson, first of all, I think the exception for Moody... I mean, it's just not, this is not content moderation. That has nothing to do with what this bill is trying to do, I guess is my broader point. Well, I do believe the monitoring and censorship provisions do. As far as parental consent age verification, what Mississippi is doing is essentially carding every user, adults and minors. But what can the state do then in that regard? Yeah, short of... Any restriction on minor usage? So, by the way, we very clearly are not saying that states lack power to do anything in this area. Well, what can they do? So, first of all, for instance, a state could pass a law that says providing parental control over minors' account termination, for instance. Again, giving not a governmental enforced power like in Brown that was unconstitutional, where it's government authority subject to a parental veto, but rather enforcing through parental control. Also, education. West Virginia and New Jersey have passed laws where schools are giving parents and kids all sorts of information about safe and responsible use of social networking websites, school restrictions, you know, school cell phone bans. There are all sorts of steps short of a draconian approach, which is every single person in Mississippi that wants to use social media has to verify their age. And we know from Brown, parental consent is not a power that the state can implement. But don't some of your members already verify age? So, on this record, in this briefing, Instagram, one of the nine websites, does some form of age verification. But I want to be clear. Is it compliant with the act? I don't know. See, isn't that the problem, though? That's the point the state's making. We don't know. And what we effectively have from the district court is as applied relief that really has the effect of facial relief. We didn't really get a record that truly goes down, as Moody seems to contemplate, into each application and each member and how this law would burden them. And actually, section by section. The act is unconstitutional carte blanche. Well, but I think if we don't know, I think that cuts against the state because of the vagueness challenge, because it's free speech. Well, you can't come in and say it's a vagueness challenge because you haven't developed the record to carry your burden. I mean, everything's vague until you actually introduce proof, isn't it? I think when you're talking about an as-applied vagueness claim, it wouldn't be our burden to come in and say, you know, this is specifically how the state is interpreting the law, and we don't quite know exactly how. Because, to give you an example, age verification requirement in this statute. It says, a digital service provider shall make commercially reasonable efforts to verify the age of the person creating an account with a level of certainty appropriate to the risks that arise from the information management practices of that digital services provider. Now, if the state would want to come in and say, Instagram, hey, they're already doing age verification. Therefore, they're not covered. Therefore, they don't need an injunction. This would be different. But if the state's not going to say that, our conduct is arguably prescribed, and we already know that the state and the defendant is attempting or credibly threatening enforcement because they move for a state-pending appeal of the injunction about only nine websites. And I do want to make this very clear. This is an as-applied injunction. This is ROA 945 of the district court's opinion. And the injunction reads that defendant preliminarily enjoined under the federal rule from enforcing sections one through eight of Mississippi House Bill 1126 against plaintiff net choice LLC's eight covered members and enumerates them. Dreamwith, Metta, which owns Facebook, Instagram, Nextdoor, Pinterest, Reddit, Snap, which owns Snapchat, X, and YouTube, pending final disposition. There's no way that's a facial injunction that applies for all parties, even non-parties. And we know from Moody, Moody distinguished facial versus as-applied. And facial is when a law is entirely invalid, whereas as-applied, even in Moody, Moody held that there was a violation there for Facebook and YouTube, specific websites. And so we heeded this court's first opinion's advice. We heeded Moody's advice. We tried to make this a case that is now about these nine specific websites. And I don't think that can be held against us. And if anything, if— I guess the question is, in proceeding with these nine members, do you have to do the work that Moody envisioned as to each of the nine members? In other words, does Moody's analysis transfer over into the as-applied context? I mean, I know they were dealing with facial challenges, but they made it very clear that this is a hard thing to prove, a hard thing to carry, a facial challenge. How about a facial challenge? But how much of this goes over to the as-applied context? Well, I don't think that this court would want to muddle up the cost or the hard burden of a facial challenge from Moody with raising an as-applied claim. I mean, an as-applied claim, and this court's free speech precedents all the time, and as-applied challenges say, you look at the actually litigating party before you, and you do the tailoring analysis. And by the way, that's exactly what the district court did here. It looked at the tailoring analysis as— I mean, the district court used the phrase as-applied dozens of times, and it was focused on these websites. And the reason it was focused on these websites is because when we amended our complaint, in our amended complaint, our preliminary injunction motion, the new Cleland Declaration from Choices General Counsel, all of that was focused on these nine websites and their policies. In addition to that, we have a declaration, say, from YouTube. And this is another aspect of this case that I don't think can go unmentioned. I mean, this declaration, ROA 109 to 132, lists out the age-appropriate experiences and minor policies that YouTube has, the minor specific content and safety policies, general content moderation practices, and YouTube's compliance obligations under the Act. So to sit here and say that we've done nothing about— on this record, I just don't think the record bears that out. And Judge Richman, I believe some of your questions earlier about what's the status of this, and are we approaching a final judgment? Remind the court, we're at a preliminary injunctive phase here. And we've submitted evidence, and this is unrebutted evidence at this phase. Now, the defendant is obviously entitled to, as we proceed with this case, to a final judgment and beyond. Have discovery of, you know, an appropriate fashion and to put in evidence. But on this record, I would submit that it's clear that our conduct is arguably prescribed. We have standing. We can raise this pre-enforcement challenge. That's actually the binding law of the case at this point under the Court's first opinion. And then the question is, are we likely to prevail on the merits? And we completely agree with the aspect of Justice Kavanaugh's statement that this law is likely unconstitutional. It directly violates Brown, violates Free Speech Coalition, which held that age verification is a burden on the access of protected speech. And Free Speech Coalition, in particular, was dealing with pornography, speech unprotected for minors. And here we're talking about billions of posts of fully protected speech, everything from football highlights to cat videos. But they can access every bit of that if their parent gives consent. They can access every bit of that if they otherwise hurdle the Act's provisions. And in Brown, that was unconstitutional, because that is a restriction on accessing protected speech. But then that goes back to my earlier question. What can the state do, though, to protect minors? Again, not from the content so much. Because they can search all this up. It's pretty clear under the Act. They can search it up. But what the Act is aiming at is these interactive messaging capabilities, the ability to approach other users, those kinds of things. I mean, there is documented, I guess, evidence, isn't there, of predatory behavior and things like that? Well, the defendants presented no evidence of that here. Now, I would also, Judge Wilson, you mentioned the exception in the monitoring and censorship provisions, which I think completely undermines the state's goal. Because there's an exception that says if the minor is deliberately searching out these categories of speech, well, that's OK. There's no way that that law is tailored to effectuating whatever goal that is trying to be accomplished by that. But isn't the other way of looking at that, as well as the definitional excluding the news sites and those kinds of things without interactive features, that's the legislature's attempt to tailor the law. I mean, in other words, you're sort of having your cake and eating it too. I mean, to the extent the state tries to tailor it, you say, well, see there, it's content-based. They're sorting. Or the kids can work around the censorship and monitoring provisions. I mean, in other words, you see what I'm saying? How is the state supposed to tailor the law then? Well, I think if it's trying to effectuate a goal that is minors aren't supposed to be reaching those categories of content, it wouldn't have that exception. Also, by the way, this is another aspect of this case where we find frustrating because we've put into evidence the fact that these nine websites have policies. This is ROA 699 to 709. They have policies that are already trying to address these categories of speech. But doesn't that suggest your members can comply with the state law? Well, we would hope so. But this is the problem because we don't know how the defendant is going to interpret such terms as promotes harassment or promotes substance abuse. And this is why we have a vagueness challenge on this in particular. I think we have a pretty good one under the Bagot decision from the Supreme Court where if the speech law uses the word promote and then attaches it to an undefined term, that invites all sorts of vagueness. So look, there's a world in which if the defendant were to say, yeah, you have these nine websites have these policies in place already and that's sufficient to satisfy this. Again, we'd be here in a different posture. We would be fine with an opinion that says that these nine websites are already complying with that provision. As far as that provision, we still need relief on the parental consent provision and age verification. But we haven't gotten that throughout this entire case. And so I would submit that when the Attorney General was moving for a state pending appeal of this injunction for nine websites and threatening enforcement, there's a disconnect there. That we already have these policies in place and the defendant clearly thinks that they're not good enough. Regardless, all of those categories, and particularly when it is combined with the word promote, sweeps far beyond historically recognized categories of unprotected speech. And so this is also overbroad. Our briefing and our complaint is detailed all sorts of categories of speech, political speech, religious speech, literature that they would be swept in by some of these factors. If I can turn to the preliminary injunctive factors. First of all, I don't think that it would be prudent for the court to read into an unreasoned Supreme Court emergency application ruling as to how it should be treating this preliminary injunction appeal. And as this court knows well, stay dockets are very different than the regular course of appellate dockets. And I don't think it can be true that that Supreme Court decision on an emergency application controls our ability to satisfy the equitable factors. For all time. And a very key distinction, and my friend brought this up, is at that time, it's what Justice Kavanaugh's opinion said, the balance of the equities, in his opinion as one justice, he believed, didn't qualify for satisfying the Supreme Court's emergency application standards. But we now know that Dreamwith and Nextdoor, two of our members, have stopped serving Mississippi users because that this law has taken effect. And also we have a declaration, this is ROA-168 for Dreamwith, that the acts compliance costs are far in excess of the available budget for Dreamwith. So these are incredibly burdensome requirements. And again, if the defendant wants to say they're so burdensome that therefore they become commercially unreasonable and therefore we're not covered and disavows enforcement, this would be a very different posture. But when we're talking about states passing speech restrictions, particularly about billions of posts of fully protected speech, the state doesn't get to pass a law that has a commercially reasonableness qualifier and then come into court and say, well, we don't know what it is and it's their burden to put in more evidence. And I think the best case for that proposition is the Supreme Court's Free Speech Coalition decision. Because in the Free Speech Coalition decision, that Texas law also required commercially reasonable measures. And no one got hung up on, oh, there needed to be more evidence about what that means and who's covered. Instead, is that act arguably prescribing conduct? Yes, therefore you get to bring a pre-enforcement challenge and then you proceed to the merits. And here, now that we have as-applied claims for these nine websites, the as-applied analysis would ask, is parental consent, is age verification, is monitoring and censorship unconstitutional as applied to YouTube, as applied to X, as applied to Reddit, as applied to these nine websites? And so this case is in a fundamentally different posture than when this court saw it the first time. And we would ask the court to affirm the district court's preliminary injunction. Thank you, counsel. We have your argument. Thank you, Your Honor. I'll try to make a few points quickly. First, I respectfully disagree with my friend, Mr. Keller, that this case is in a fundamentally different posture. It's the exact same posture because the district court granted facial relief. We know that not just from Fitch, we know it from Moody. The Paxton injunction at issue in Moody, in the companion case, blocked a laws enforcement, quote, against plaintiffs and their members, end quote. So it was plaintiff and member specific. The basic fundamental premise of the entire Moody decision is that that was facial relief. Exact same thing here. Judge Ingleheart, you pointed out that page 809 of Moody says things that are quite critical to as-applied claims. As apparent from my opening presentation, that's clearly true. You have to know what NetChoice has to do in order, under the Act, in order to see if any of those things violate the First Amendment. Mr. Keller repeatedly kind of threw off this idea that his client's burden is to make that showing. He instead repeatedly kind of fell back on this idea of a threat of enforcement that NetChoice has shown standing. Yet, sure, we agree at this stage that they've shown standing. The problem is they've never even tried to identify for a single member what one commercially reasonable application would be. And that is the thing that dooms any claim for relief whatsoever. This kind of idea of trying to leverage standing where the attorney general should decline to enforce doesn't get them anything. Declining to enforce, the attorney general can't reasonably decline to enforce here when it's dealing with a party that has proceeded on declarations that are based on clear errors. Again, he mentioned DreamWith, the idea that it would have to shut down. This Act requires commercially reasonable actions, not cost-prohibitive actions. NetChoice at least needs to try to make that showing. That's its burden under whatever kind of claim it brings for injunction. But what do you do with the vagueness of that sliding scale, whatever is commercially reasonable for each particular member? I don't agree that it's vague. How do you pick that? I think you look at the platform and you say, look, here are available commercially reasonable options for me, DreamWith. None of them are feasible. But I mean, how do you do that? Do you do that on gross revenue? Do you do it on market share? Do you do it on number of users? Is it, I mean, how are the NetChoice members, individual members to know whether the law is going to excuse their ability or inability to do whatever it is to comply? Well, I think they first have to try to make that kind of effort. Say, these are the resources we have available. They haven't even, my friend mentioned Instagram. We are the ones who had to bring forth the fact that Instagram does age verification. NetChoice has refused to say what age verification entails on Instagram, whether it's reasonable, whether it can be done on a large scale, and whether and why it actually burdens speech on the platform. Facebook also does some measure of age verification. Again, we had to bring that to the court's attention. NetChoice has not. And so, again, I come back repeatedly, of course, to the fundamental thing that requires reversal here is NetChoice has refused to carry its burden and it's repeatedly tried to urge the district court to let it not carry its burden. This court shouldn't allow that. And I would just make perhaps another couple little things. You know, Brown came up a number of times. Brown does not erect some per se rule against parental consent laws. Again, there are laws requiring parental consent for body piercing, tattoos, things like that, highly, highly expressive activities. What Brown says is that the parental consent mechanism in that case triggered and failed strict scrutiny because it is content-based. Our law is not content-based. Well, but how is it not content-based? You know, it's kind of how you look at the diamond, right? The other side says, well, you've got this definitional section that excludes news sites and sports sites and ESPN or whatever it may be and LinkedIn, professional sites. That's content. I mean, you're segregating the initial pot of who's covered and who's not, pots of who's covered and who's not, by content. I see I'm going to run out of time. Can I make two responses to that, Your Honor? Thank you, Your Honor. Two points, Your Honor. One is news, sports, if Facebook were to change tomorrow and say news and sports is all we're doing, it would still be covered because it's primarily interactive. I think, as Your Honor's questions were highlighting earlier, it's the interactive features that bring somebody within the scope. And merely the fact that there is a reference, arguably, to content under cases like City of Austin and other cases. But the very interactivity, Chief, may I continue? Sure. The very interactivity is also speech, is it not? I mean, in other words, isn't that content-based? No, because it's not the content of the interaction. It's not like, oh, you're having social discussions, we don't like those, or political discussions, we don't like those. It's the fact that there's an interactive feature where adults can interact directly with children, have information piped to them, and use that information to exploit and potentially seriously harm children. That's what, so the act in short, the way I'd maybe sum it up, Your Honor, in reference to the court's cases is, as the Free Speech Coalition case emphasized, if a law can be justified without reference to its speech and on other grounds, that takes it out of the content-based category. And I think it's your questions we're alluding to earlier, is that we're focused on predatory interactions and trying to regulate and target those. We ask the Court to reverse. Thank you, counsel. Thank you, Your Honor. That will conclude our arguments for this morning.